## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **HAMMAD M. ELGHAZALI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 12-CV-13-PJC** |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Claimant, Hammad M. Elghazali ("Elghazali"), pursuant to U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying his application for disability benefits under the Social Security Act,

42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have

consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be

directly to the Tenth Circuit Court of Appeals.  Elghazali appeals the decision of the

Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ

incorrectly determined that Elghazali was not disabled.  For the reasons discussed below, the

Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

At the time of the May 14, 2010 hearing before the ALJ, Elghazali was 40 years old. (R.

27, 109).  He had a tenth grade education, could read a little English, and could not write.  (R.

27).  He previously worked as a vehicle detailer from 1994 to 1996 and worked in lawn

treatment from approximately 1999 to 2007. (R. 41-42, 144).

Elghazali testified that he injured his back in 2004 and subsequently had a disc fusion

surgery.  (R. 30).  After this surgery, Elghazali returned to work.  *Id.*  Elghazali testified that he

had another injury resulting in a second fusion surgery in 2007 on the L4, L5, and S1 discs.  *Id.*

A month or two after this surgery, Elghazali returned to his treating physician, Dr. Anagnost,

complaining of pain.  (R. 31).   According to Elghazali, Dr. Anagnost attributed this pain to the

hardware, Dr. Anagnost expected it to get better, and that additional surgery was not an option at

the time because his spine was too weak.  *Id.*  Elghazali testified that after this visit, the pain

worsened over time.  *Id.*  Dr. Anagnost then did an MRI which showed evidence of an infection

and swelling in the back.  *Id.*  Elghazali testified he underwent a third surgery in 2010 due to the

infection and painful hardware.  (R. 31).

Elghazali testified that he had trouble taking care of his personal needs because of pain,

so his wife helped him a lot.  (R. 32).  He was unable to take care of his lawn, help with meal

preparation, play with his children, go out with friends or his wife, or sit in a chair.  (R. 34-35).

Elghazali described his pain as radiating from his back, down both his legs, and into his toes.  (R.

33).  This pain radiated to his toes 3 to 4 times a day and would last 5 to 6 minutes.  (R. 34).  He

described feeling pressure and sharp pain in his back when he lifted or carried items.  (R. 33).

He stated that his feet sometimes went numb.  *Id.*  When sitting, Elghazali experienced pain in

his lower back, and he testified that he would need to lie down to take the pressure off his back.

(R. 34).  Elghazali testified that since 2008 or 2009, he spent almost all day lying down.  *Id.*

Elghazali testified that he began taking hydrocodone in 2004, and was currently taking

Oxycodone for pain.  (R. 35-36).  Although he was prescribed to take it "four time a days, every

four to six hours," he had been gradually taking more pills more frequently.  (R. 35).  He stated

that the Oxycodone made him dizzy, and that he had been to the emergency room because of a

racing pulse and numbing on the left side of his body.  *Id.*  Elghazali testified that the doctor,

after completing blood work, believed these symptoms to be side effects of his medication.  *Id.*
Elghazali also stated that he had been taking muscle relaxers and Risperdal.[1]  (R. 35-36).

Elghazali testified that he had a screw in his left knee from his past knee surgery and he
still felt a really sharp pain.  (R. 36-37).  He also described a prior hernia surgery and stated that
he could still feel "something hard" and had been told to see the surgeon to determine whether
additional surgery was necessary.  *Id.*  Elghazali spoke about a shoulder injury that resulted in a
slightly torn ligament.  (R. 38).  He decided not to have surgery on his shoulder, but he
mentioned that it still bothered him when he reached for things.  *Id.*

Elghazali did not return to work after his 2007 back surgery because his manager told
him that there were no jobs consistent with his new lifting restriction of 15 pounds.  (R. 33).
Elghazali stated that he did not believe he could return to the work that he had done in the past.
(R. 38-39).  He also testified that he did not believe he could do any other type of work because
of his limited education.  (R. 39).

According to medical records, on September 28, 1994, Elghazali underwent surgery on
his left knee.  (R. 314-18).  An injury at work had resulted in a deficient anterior cruciate
ligament and a meniscus tear.  (R. 316).  Elghazali was discharged with a referral to physical
therapy and a restriction on quads sitting and squatting.  *Id.*  This operation left him with two
screws in his knee.  (R. 318).

Elghazali had his first spinal fusion on June 23, 2004, with the L5/S1 discs fused by
pedicle screws and rods.  (R. 222, 243).  Medical records reflect this surgery had gone well and
he had few problems until approximately December 2005.  (R. 181, 222).

After injuring his right shoulder, Elghazali underwent an MRI on October 7, 2005.  (R.

---

[1] Risperdal is used to treat schizophrenia and bipolar I disorder.  *www.pdr.net*.

184-86, 234-35).  The MRI showed evidence of a rotator cuff tear and a bone cyst.  (R. 185,

234).  On October 20, 2005, Dr. Victor Palomino examined Elghazali and recommended a

corticosteroid injection and physical therapy.  (R. 223-34).

Elghazali visited Dr. Steven Anagnost on January 17, 2006 with complaints of lower

back pain, which had worsened in the past month.  (R. 222).  Dr. Anagnost noted that Elghazali's

pain was directly on the area of the hardware and incision from the previous surgery, and that in

addition to the back pain, Elghazali had radiating pain into his legs.  *Id.*  Dr. Anagnost ordered a

repeat MRI, which revealed a "moderate central posterior disc herniation which moderately

indent[ed] the thecal sac" at L2/L3, a "small posterior disc herniation which mildly indents the

thecal sac" at L3/L4, and a "large central posterior disc herniation and hypertrophic changes in

the posterior elements which result[ed] in moderately severe acquired spinal stenosis[2]" at

L4/L5.  (R. 222, 243).  These results led Dr. Anagnost to believe that stabilization would be

needed at the L4/L5 level, but that the L2/L3 and L3/L4 would not need surgery since those

levels were not symptomatic.  (R. 219).

Elghazali presented to his primary care physician, Dr. Khalid Gawad, on February 14,

2006 with pain in his right groin area.  (R. 210).  The pain became more pronounced when he

coughed or strained.  *Id.*  Dr. Gawad noted that there was some tenderness in the right lower

quadrant of Elghazali's abdomen.  *Id.*  Dr. Gawad prescribed Skelaxin[3] to be taken three times a

day.  *Id.*  He also referred Elghazali to Dr. Gary Decker for a CT scan for a possible right

---

[2] Spinal stenosis is the abnormal narrowing of the vertrebral canal or nerve root canal
caused by the encroachment of bone upon the space.  *Dorland's Illustrated Medical Dictionary*
1698 (29th ed. 2000) (hereinafter "*Dorland's* 29th").

[3] Skelaxin is used to relieve discomfort associated with acute, painful musculoskeletal
conditions.  *www.pdr.net.*

inguinal hernia.[4]  (R. 210, 220-21).  Dr. Decker confirmed the presence of a right inguinal hernia

on February 15, 2006 and performed a surgical repair of the hernia at Hillcrest Medical Center

on February 23, 2006. (R. 187-89, 220-21).  Dr. Decker noted that Elghazali tolerated the

surgery well and Elghazali was released from his care on March 6, 2006 after a good recovery.

(R. 188, 218).

On June 14, 2007, following an emergency room visit due to a work injury, Elghazali

saw Dr. Anagnost for low back pain.  (R. 254-55).  Dr. Anagnost noted that Elghazali had

tenderness along the thoracolumbar[5] junction.  (R. 254).  He had a negative straight leg raise test

and had symmetrical deep tendon reflexes at L4 and S1.  *Id.*  Elghazali was diagnosed with

thoracolumbar instability with intermittent radiculitis.[6]  *Id.*  Dr. Anagnost recommended

injections of his lumbar spine and aggressive physical therapy.  *Id.*  Dr. Anagnost noted that it

was "safe for [Elghazali] to resume his regular activities at work slowly" but that he "should

wear his [back] brace whenever he is at work."  (R. 255).

After being referred by Dr. Anagnost, Elghazali was examined by Dr. Jean Bernard on

June 29, 2007 for his back pain.  (R. 248-49).  Elghazali characterized his back pain as severe

thoracolumbar pain that radiated to his groin area and to his thigh, mainly on the right side.  (R.

248).  Elghazali tested negative on the Spurling[7], straight leg raise, and tension tests.  (R. 248).

---

[4] An inguinal hernia is the herniation of a loop of intestine into the inguinal canal. *Dorland's Illustrated Medical Dictionary* 861 (31st ed. 2007) (hereinafter "*Dorland's* 31st").

[5] The thoracolumbar area pertains to both the thoracic and lumbar portions of the spine. *Dorland's* 29th at 1834.

[6] Radiculitis is the inflammation of the root of a spinal nerve, particularly the portion which lies between the spinal cord and the intervertebral canal.  *Dorland's* 29th at 1511.

[7] The Spurling test evaluates cervical nerve root impingement.  *www.medilexicon.com*. The test is performed by having the patient rotate the head toward the symptomatic side, the examiner then applies pressure to the top of the patient's head, and the test if positive if radicular

Dr. Bernard's examination revealed tenderness at the lumbosacral muscles, the previous hardware site, and at the sacroiliac joints on both sides. *Id.* Dr. Bernard's impression was that Elghazali suffered from low back pain secondary to posterior disc protrusions, resulting in spinal canal stenosis, and post-surgical changes. (R. 249). Dr. Bernard proceeded with a steroid injection, which Elghazali tolerated well. *Id.*

Elghazali saw Dr. Anagnost on July 17, 2007, as a follow-up to the injection and reported that it had not helped very much. (R. 256). Elghazali still had a "moderately painful range of motion," but reported that overall, he could tolerate the pain. *Id.* Dr. Anagnost did not recommend further surgery or diagnostic studies and released Elghazali back to his regular work, as tolerated, with directions to use his back brace as needed. *Id.*

Elghazali returned to Dr. Anagnost on August 28, 2007 with increased back pain. (R. 212-13). He had radiculopathy[8] into his lateral calf with diminished deep tendon reflexes. *Id.* An MRI showed "mild broad-based posterior disk bulge" resulting in "borderline spinal stenosis" at L2/L3, "broad posterior disk bulge" also resulting in "borderline spinal stenosis" at L3/L4, and "small posterior disk bulge and hypertrophic changes in the posterior elements" resulting in "mild spinal stenosis" at L4/L5. (R. 211). Believing L4/L5 was causing the increased symptoms, Dr. Anagnost recommended surgical stabilization at L4/L5 and hardware removal at L5/S1. (R. 212-13).

On October 3, 2007, Dr. Anagnost performed Elghazali's second back surgery; he fused L4/L5 and removed the hardware from L5/S1. (R. 180-83, 201-07). Following the procedure, Elghazali was able to ambulate easily with relief of his pain symptoms. (R. 183, 204). Elghazali

_____

arm pain results. *Id.*

[8] Radiculopathy is a disease of the nerve roots. *Dorland's* 29th at 1511.

6

was discharged with prescriptions for pain medication and instructions to follow up with Dr.

Anagnost in one month.  (R. 207).  He was also instructed to wear his back brace when he was

up, to avoid excessive riding in a car, and not to lift, bend, stoop, or twist.  *Id.*

Elghazali saw Dr. Anagnost for a post-operative visit on November 1, 2007.  (R. 236).

He reported that almost all of his preoperative pain was gone.  *Id.*  Dr. Anagnost noted that

Elghazali had been walking over two miles a day and x-rays showed excellent alignment.  *Id.*

Dr. Anagnost recommended Elghazali's physical restrictions remain the same until his next

appointment.  *Id*.

On December 4, 2007, Elghazali returned to Dr. Anagnost and reported that he was doing

well, but had some tenderness in his tailbone, possibly due to an increased amount of sitting.  (R.

237).  Dr. Anagnost supplied him with a donut for support and indicated that at Elghazali's next

visit, he planned to slowly wean Elghazali off of his back brace and allow him to return to some

light duty work.  *Id.*

Elghazali was seen by Dr. Anagnost again on January 3, 2008.  (R. 216).  Dr. Anagnost

noted that Elghazali was steadily doing better, though he was still experiencing some

dysesthesias[9] and pain in his legs.  *Id.*  However, Elghazali did report that it was much better

than before his operation.  *Id*.  Dr. Anagnost expressed concern that Elghazali may not be able to

return to his previous employment due to what would likely be permanent restrictions.  *Id.*

On January 24, 2008, Elghazali returned to Dr. Anagnost, who noted that Elghazali was

doing very well and was satisfied with the results of his surgery.  (R. 214-15).  Both Elghazali

and Dr. Anagnost expressed concern that he would not be able to return to his previous work in

---

[9] Dysesthesia is the "distortion of any sense, especially of that of touch," or "an unpleasant abnormal sensation produced by normal stimuli."  *Dorland's* 31st at 584.

lawn care. (R. 214). Dr. Anagnost specifically noted "that this line of work may again be difficult for him and I am worried that he may end up back in the operating room again if he continues to do such heavy-type work." *Id.* Dr. Anagnost recommended a Functional Capacity Evaluation ("FCE") be completed to determine final work recommendations. *Id.*

On February 28, 2008, based on the completed FCE, Dr. Anagnost opined that Elghazali had reached maximum medical improvement. (R. 241). He recommended permanent restrictions on frequent pushing, pulling, lifting, or carrying 15 pounds, and only occasional lifting up to 35 pounds. *Id.*

On February 9, 2009, Elghazali's primary physician, Dr. Gawad, prescribed him Lortab for low back pain. (R. 208). On August 25, 2009, Elghazali presented to Dr. Gawad with additional complaints of low back pain. (R. 319). Dr. Gawad found there to be tenderness in Elghazali's lumbosacral region, diagnosed him with a muscle strain, and prescribed Flexeril and Percocet. *Id.*

On February 18, 2009, Elghazali was examined by Kenneth R. Trinidad, D.O., regarding his work-related injuries for purposes of a workers' compensation claim. (R. 265-68). Examination revealed tenderness and spasm in Enghazali's spine at L4 through S1 bilaterally. (R. 266). Elghazali was very stiff getting up from a seated position during the examination. *Id.* Dr. Trinidad further noted that Elghazali had a negative straight leg raise test at 70 degrees. *Id.* Dr. Trinidad indicated that Elghazali had a limited range of motion in his hips, his lumbar spine, and with right and left lateral bending. *Id.* Dr. Trinidad also noted that Elghazali had decreased sensation in the left leg and weakness in both legs. *Id.* Dr. Trinidad found that Elghazali had difficulty standing or sitting for more than short periods of time. (R. 267). Taking into consideration Elghazali's previous injuries and impairment findings, as well as his more recent

injuries, Dr. Trinidad found Elghazali to have a 45% permanent partial impairment to his whole body and to be 100% permanently and totally disabled on an economic basis.  *Id.*  On June 24, 2009, Dr. Trinidad drafted an addendum to his evaluation and noted that Elghazali's prior knee injury, which was not a part of his initial evaluation, would be an additional 15% permanent partial disability, resulting in a 60% permanent partial disability to his body as a whole, which still resulted in 100% permanent disability on a physical and economic basis.  (R. 312-13).

Elghazali next presented to Dr. Gawad on March 24, 2010 to discuss his back pain.  *Id.*  Dr. Gawad ordered an MRI and referred him back to Dr. Anagnost.  *Id.*  The MRI showed "facette joint overgrowth, thickening of the ligamentum flavum, and asymmetrical annulus bulging" at L3/L4, resulting in "mild spinal stenosis and bilaterial inferior foraminal stenosis."  (R. 328).  It also showed edema[10] at the surgery site of L4/L5.  (R. 327).

On April 2, 2010, Elghazali was seen by Dr. Anagnost for his increased back pain.  (R. 333-34).  Although Dr. Anagnost noted that Elghazali's fusion looked good at L4/L5 and L5/S1, the MRI showed collapse, instability, disc protrusion, moderate stenosis, and slight retrolisthesis[11] at L3/L4.  (R. 333).  Dr. Anagnost recommended hardware removal at L4/L5 and spinal decompression at L3/L4, in hopes to avoid another fusion.  *Id.*

Elghazali had his third back surgery on April 19, 2010 after "conservative treatment" had "failed" and his symptoms "consistently worsened."  (R. 341-47).  Examination prior to the surgery revealed axial back pain, tenderness, pain with flexion and extension, pain along his anterior thigh and into the calf bilaterally, and diminished reflexes at L4 on the right.  (R. 342).

---

[10] Edema is a medical term for swelling and indicates the presence of abnormally large amounts of fluid in tissue spaces.  *Dorland's* 29th at 567.

[11] Retrolisthesis is the "posterior displacement of one vertebral body on the subjacent body."  *Dorland's* 31st at 1660, 1661.

Elghazali tolerated the surgery well and awoke with some relief of his pain.  (R. 346).  Dr.

Anagnost noted that there was the possibility of further spinal instability in the future and he did

not expect Elghazali's pain to ever be completely relieved.  (R. 342).

After this final surgery, on May 3, 2010, Dr. Anagnost supplied a physical medical

source statement and conducted a Residual Functional Capacity Evaluation.  (R. 338-40).  In this

source statement, Dr. Anagnost opined that Elghazali could frequently lift and carry up to five

pounds, and could occasionally lift and carry up to ten pounds.  (R. 338).  He further stated that

Elghazali should never bend, squat, crawl, or climb, and that he should only occasionally reach.

(R. 339).  Dr. Anagnost reported no limitations to Elghazali's upper extremities.  *Id.*  Dr.

Anagnost noted that Elghazali could sit for 3 hours, stand for 2 hours, and walk for 1 hour at one

time.  (R. 338).  He further noted that during an 8-hour work day, Elghazali could sit for 4 hours,

stand for 2 hours, and walk for 1 hour total.  *Id.*

Agency consultant Joel Justin Hopper, D.O., completed a physical consultative

examination of Elghazali on May 6, 2009.  (R. 291-95).  Upon examination, Dr. Hopper noted

that Elghazali moved all extremities well, except for the left knee, which had painful and

reduced flexion.  (R. 292).  Elghazali was able to move around the room easily and walked with

a stable gait.  *Id.*  Dr. Hopper noted that Elghazali tested positive bilaterally on the straight leg

raise test in seated and supine positions.  (R. 292-93).  Dr. Hopper also noted that Elghazali had a

reduced and painful range of motion of the lumbosacral spine.  (R. 293-94).  Dr. Hopper

assessed Elghazali with chronic low back pain, herniated L4/L5 disc, post-lumbar surgery,

extremity radiculopathy and painful range of motion in his left knee.  (R. 292).

Dr. Thurma Fiegel, M.D., a non-examining agency medical consultant, completed a

Physical Residual Functional Capacity Assessment on May 12, 2009.  (R. 296-303).  She

indicated that Elghazali could occasionally lift or carry 10 pounds and could frequently lift or carry less than 10 pounds and had no other pushing or pulling limitations. (R. 297-98). She noted that Elghazali could stand or walk at least 2 hours in an 8-hour workday and could sit with normal breaks for about 6 hours in an 8-hour workday. *Id.* Dr. Fiegel marked that Elghazali could only occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 298). She further indicated that Elghazali had no manipulative, visual, communicative, or environmental limitations. (R. 299-300). In the comments section, Dr. Fiegel summarized Dr. Trinidad's February 18, 2009 examination, noted Elghazali's ability to perform personal care, and briefly referred to Dr. Hopper's examination. (R. 265-68, 297-98).

On April 14, 2009, Dr. Sharon Taber, Ph.D., a non-examining agency consultant, completed only the "Consultant's Notes" section of a Psychiatric Review Technique form. (R. 275-88). Dr. Taber noted that Elghazali alleged he was depressed and that he would become angry at his 3-year-old son, but did not report difficulty with memory, task completion or concentration. (R. 287). Dr. Taber also noted that Elghazali had not been to counseling and was not taking any medication for his depression. *Id.* Dr. Taber opined that any limitations in his activities of daily living were the result of physical problems. *Id.* Dr . Taber concluded that "further development of the case is not warranted." *Id.*

Nonexamining agency consultant Burnard Pearce, Ph.D., reviewed the record on September 14, 2009, and affirmed Dr. Taber's April 14, 2009 assessment. (R. 306). On September 18, 2009, nonexamining agency consultant Luther Woodcock, M.D., reviewed the medical evidence in the record and affirmed Dr. Fiegel's May 12, 2009 assessment. (R. 305).

### Procedural History

On March 24, 2009, Elghazali filed applications for Title II disability insurance benefits

and for Title XVI supplemental security income, under the Social Security Act, 42 U.S.C §§ 401 *et seq*.  (R. 122-32).  Elghazali alleged the onset of his disability began October 1, 2007.  (R. 122, 126).  Elghazali's applications for benefits were denied initially and on reconsideration.  (R. 45-48, 49-51).  A hearing before ALJ Lantz McClain was held on May 14, 2010 in Tulsa, Oklahoma.  (R. 22-43).  By decision dated June 9, 2010, the ALJ found that Elghazali was not disabled.  (R. 8-17).  On November 9, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-3).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other  kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[12]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[12] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further  inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met,

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether  the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'"  *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Elghazali met insured status through December 31, 2012.  (R. 8).  At Step One, the ALJ found that Elghazali had not engaged in substantial gainful activity since October 1, 2007, his alleged onset date of disability.  (R. 10).  At Step Two, the ALJ found that Elghazali had severe impairments of "Status Post Lumbar surgery (x3), status post remote left knee surgery, [and] status post right inguinal hernia repair."  *Id.*  At Step Three, the ALJ found

---

the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

that Elghazali's impairments, or combination of impairments, did not meet the requirements of a Listing.  (R. 11).

The ALJ determined that Elghazali had the RFC to perform the full range of sedentary work.  *Id.*  At Step Four, the ALJ found that Elghazali was unable to perform any past relevant work.  (R. 16).  At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Elghazali was capable of performing, considering his age, education, work experience, and RFC.  *Id.*  Therefore, the ALJ found that Elghazali was not disabled from October 1, 2007 through the date of his decision.  (R. 17).

**Review**

On appeal, Elghazali contends that the ALJ did not properly evaluate the medical source evidence.  The Court agrees that the ALJ did not properly evaluate the opinion evidence of record and therefore the ALJ's decision must be reversed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  A treating physician's opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record.  *Hamlin*, 365 F.3d at 1215; *see also* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  However, even if the ALJ determines that the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed according to the factors set out in Sections 404.1527(d) and 416.927(d).  *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).  Those factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and

14

> the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. U.S. Dept. of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995).  The ALJ

is required to give specific reasons for the weight he assigns to a treating physician opinion, and

if he rejects the opinion completely, he must give specific legitimate reasons for that rejection.

*Id*; *see also Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished) (*citing*

SSR 96-8p, 1996 WL 374184).

In weighing the opinion evidence of record, the ALJ stated that "[w]hile Dr. Anagnost's

opinion is given some weight as the claimant's treating physician, it is not given full weight."

*Id.* The ALJ subsequently stated that he afforded the opinions of the agency consultants

"significant weight."[13]  (R. 16).  These conclusory statements were the only discussion provided

by the ALJ.  There was no further explanation of how the ALJ weighed the opinions of Dr.

Anagnost or of the agency consultants.

In his discussion of the medical evidence, the ALJ mentioned Dr. Anagnost's May 3,

2010 opinion regarding Elghazali's residual functional capacity.  (R. 15).  The ALJ recited Dr.

Anagnost's opinion that Elghazali could lift up to five pounds frequently, from 6-10 pounds

occasionally, and could sit and stand for a total of 4 hours in an 8-hour workday.  *Id.*  The ALJ

further recited Dr. Anagnost's opinion that Elghazali was "limited in the use of feet for repetitive

movement," though Elghazali had "no limitation in his use of upper extremities."  *Id.*   After

setting forth Dr. Anagnost's opinion, the ALJ provided no analysis or explanation for his

---

[13] The undersigned assumes that the ALJ was referring to the opinions of Dr. Fiegel and Dr. Woodcock, though they were not identified by name in his decision.

decision to give "some" but not "full" weight to Dr. Anagnost's opinion.

The reasons given by an ALJ for rejecting or lessening the weight given to a treating physician's opinion must be "sufficiently specific to enable [the court] to meaningfully review his findings." *Langley*, 373 F.3d at 1122-1123. Here, the ALJ did not address any of the *Goatcher* factors when deciding how much weight to give to Dr. Anagnost's opinion. (R. 15). He did not discuss the length of the treatment relationship between Elghazali and Dr. Anagnost, which spanned several years, or how he weighed the nature and extent of that treatment relationship. The ALJ did not address the degree to which Dr. Anagnost's opinion was supported by relevant evidence; whether Dr. Anagnost's opinion was consistent with the record as a whole; whether he was a specialist in the area of spinal injuries; or any other factors that hinder or support Dr. Anagnost's opinion. Because the ALJ did not supply the requisite specific reasons for rejecting Dr. Anagnost's opinion, there is nothing for this Court to review. *See Langley*, 373 F.3d at 1123 (citation omitted).

The ALJ summarized Dr. Hopper's evaluation, but it did not contain a true medical opinion for him to weigh. *Cowan v. Astrue,* 552 F.3d 1182,1188-89 (10th Cir. 2008), 20 C.F.R. § 1527(a)(2) (requiring a "true medical opinion" contain a physician's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform"). The ALJ did not specifically discuss or analyze the opinions of Dr. Fiegel, Dr. Taber, Dr. Woodcock, or Dr. Pearce, yet concluded their opinions were entitled to "significant weight" because those opinions were reportedly "consistent with medical evidence of record and the limitations are logical based upon the claimant's impairments." (R. 16). The ALJ did not identify what medical evidence he found consistent with those opinions or why that evidence was inconsistent with Dr. Anagnost's opinions. The

Court can only guess why the ALJ chose to give the opinions of these non-examining consultants more weight than the opinions of Dr. Anagnost.  Because the ALJ failed to follow the correct legal standards in evaluating and weighing the medical opinions of record, remand is necessary. *Robinson*, 366 F.3d at 1083; *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

In his brief, the Commissioner offers reasons, with specific evidence, why Dr. Anagnost's opinion was not sound.  But these reasons, and the references to specific evidence, were not included in the ALJ's decision or reasoning.  The Court will not engage in *post hoc* attempts to save the ALJ's decision by supplying rationales that the ALJ did not supply. *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) ("*post hoc* rationale is improper because it usurps the agency's function of weighing and balancing the evidence in the first instance").  The ALJ's decision must be reversed so that the ALJ can properly consider the opinion evidence.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003) (*citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988)).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 15th day of February 2013.

Paul J. Cleary
United States Magistrate Judge